May it please the Court, my name is Sergei Lemberg. I represent Noah Duguid in this appeal. With the Court's permission, I will go seven minutes, hand the baton over to the Government for five, and reserve three minutes for rebuttal. I think after Mark's, it is clear that the original basis for the District Court's dismissal of the complaint is no longer valid. That is, it is clear that the complaint sufficiently pleads that Facebook here used a machine that stored numbers and then dialed them without human intervention. How do we know that? Well, how do we know it's plausible? The complaint says, and logic suggests, that Facebook stored our client's number within its system and then sent text messages to it. So what's left here for Facebook to argue? And I will submit to the Court that there are two issues on which, sort of two beams, infirm beams on which Facebook's arguments rest. The first is sort of a policy-type argument. Facebook says, well, geez, if you expand the applicability of the statute to so-called responsive text messages, all hell will break loose and all responsive text messages will become illegal. And I say, well, let's go back to the basics. This is a consumer protection statute that protects people's privacy. The law is clear for a century, well, a little less than a century, that you interpret them broadly, statutes like this. The law is clear that you interpret exceptions narrowly. And then there is no law at all on reading an exception like this in to a statute. And then interpreting it to swallow the entire rule. There is simply no, nothing in the statute that would allow the Court to read in a so-called responsive text spam exception into the Telephone Consumer Protection Act. So that's the first. I guess this maybe falls into the category of no good deed goes unpunished. Because as I understand it, the text message was generated here because of the possibility that someone with that number is contacting the Facebook account, correct? My client has nothing to do with Facebook. I understand that. I mean, your client says, look, I've never been a Facebook person, right? And there are others like him who complain online. I understand. For whatever reason. And do we know from the complaint whether the telephone number that your client has was a number that someone else had before? Not from the complaint. My client was never able to get any human from Facebook to respond to him and adjust the situation. But we don't know that from the record at this point. I mean, from the complaint, we don't. There's some suggestion that somebody erroneously entered that number in, I guess, in some of the briefing. That remains for factual development. We don't know. But let me just address the good deed goes unpunished suggestion. I think a lot of telemarketers would say, well, geez, people want our services. They want us to reach out to them. They want us to sell them shoes, apples, whatever. And the answer is, sure, you can do it. The Telephone Consumer Protection Act does not forbid automated text messages. It allows them with consent. My point is, you've probably moved it to a different platform, is not in the case of general telemarketers. I'm saying with respect to the algorithm that Facebook employs here, the notion was to give advice of an unrecognized device, correct? It was a broken system, Judge. Their system is broken, but that was the purpose of it. I mean, the idea was, sure, to do authentication, to let people know all they have to do when the person says off, as they themselves say, as we say in the complaint, they themselves have instructions. You want the messages to stop? Type off. The messages will stop, but they don't. The system is broken, and it generates text message spam that we all hate, and it falls within the statute. Now, the statute, by the way, answers your question. It says, in the damages section, it says if it's a willful violation, you pay up to $1,500. But if it's a statutory violation, it's $500. So that is part of the statutory scheme. Now, on to the second basis for the district judge's dismissal that is left here, and that is so-called suggestion that these are customized messages. I say the district court ignored the standard here. The standard, it's a 12B6 standard, accept what the plaintiff says is true, and interpret the complaint in light most favorable to the plaintiff. The district court said, no, I don't believe you that this computerized system, which you plead in the complaint, generates spam from a template. Look, we've all gotten these phone calls. You know, is this Sergei Lemberg? If this is Sergei Lemberg, press one. If it's not, press two. Mr. Lemberg, you know, your student loan rates have never been lower. We all get these messages. It's implausible, unbelievable that this kind of spam is customized, bespoke. It's a computer algorithm that alters one or two things, your name or your last name. In this case, the browser and the time, and then spits out spam. So that basis for the dismissal of the complaint cannot stand either under proper interpretation, the district court ought to have allowed us to proceed past this, irrespective of the Facebook suggestion that the messages were customized. What's your best case that you're relying upon? Marks. Marks, Flores. It came out after the district court. We filed a motion for reconsideration following Flores. We thought that Flores should have caused the district court to reconsider its decision. The district judge stuck to his decision. We just did not think that filing anything in the district court following Marks would lead to any different results. But I think that under both decisions, the three opinions, really the two dispositive ones ought to be overturned, and the case ought to be returned to the district court for factual development. Thank you. I'm going to hear from the government. May it please the court. Lindsay Powell for the United States. There may be reasons not to reach the constitutional question in this case, but if the court were to get there, it should emphatically reject the arguments advanced by Facebook that the The restriction itself has been in effect for almost 30 years now, and it prevents millions of unwanted, invasive phone calls made by the use of these automated technologies every single day. This court has twice upheld the restriction as it was originally enacted in both Moser and Gomez. Facebook now contends that a recent amendment enacted in 2015, which relates to conduct that has nothing to do with this case, somehow renders the entire scheme unconstitutional, and that's just not the case. I would also note that the amendment itself postdates the conduct alleged in this case. So the text messages at issue were sent in 2014, almost two years before the late 2015 enactment of the amendment at issue, and there's no basis for applying the amended version of the statute retroactively. If you considered the example of a call to collect government-backed debt, for example, which previously was not allowed under the amendment, certain of those calls will be allowed, but we know that a call made to collect government-backed debt in 2014 would not suddenly become lawful because of the 2015 amendment, and that just underscores the retroactivity analysis here. The 2014 conduct is governed by the 2014 law, which did not contain the amendment at issue, and so that suffices to resolve the constitutional inquiry. If we were to go a little further, which we may or may not, but do you agree that the carve-out for government debt collection is content-based? No, Your Honor. We've taken the position that it's more akin to the exceptions that were upheld by the Seventh and Eighth Circuits in Patriotic Veterans and Van Bergen, where the courts, looking at analogous state schemes, found that the exceptions at issue were more based on the relationship between the parties rather than the content of the call itself. And, of course, this exception is a little bit different. It's not necessarily a relationship between the caller and the person being called. Correct. But it is a relationship. It doesn't matter. Well, but the problem is it's not really the government. It's somebody else collecting for the government, right? Right, but on the government's behalf. But the dispositive thing is that it's not solely based on what's being said. You could have two identical calls here following exactly the same script to collect a debt, and whether or not they'll fall within the exception will depend on whether the debtor, the person being called, has this past due loan with the government. And so there is this essential element that isn't tied up in the content of the message, and that makes this unlike Reed, unlike Kerry, where the court said in those quintessential cases of content-based regulation, what is being said, the subject matter of the speech is dispositive. That's the sole thing on which the regulation turns, and that's not what we have here. Did the district go ahead? Had the Congress actually, is there anything they said of why this particular, what appears to be an effort to get all of the student loans paid back? Is there anything in the record that would demonstrate why they put this? It's a very odd sort of a thing to drop in. So two things about that, Your Honor. The exception was first introduced in the budget submitted, the presidential budget submitted to Congress, and as part of that budget, the estimate was that the exception would facilitate the collection of about $10 million a year for the government. And so those would be monies that would otherwise be paid out of the public fisc that would not be lost by the government as a result of the exception. So there's the important protection of the public fisc motivation, but then there's also, and this gets sort of farther down the analysis into the tailoring, but if you look at the privacy interest, which ultimately, of course, is what the restriction itself is meant to prevent, these really intrusive calls that hit us any time of day in the most private places, that the restriction itself prevents millions of these every single day, and the narrow exception for government collect debt does not make a meaningful inroad into that. So this is not... I'm kind of wondering why I get those, since I didn't actually have any government school debt. Well, that sounds like a violation of the act, and we are always working on enforcement. But in terms of the privacy interest that the act is meant to prevent, the auto dollar restriction itself still does a huge amount of work in preventing these calls, notwithstanding the addition of the government debt exception. So it does allow some additional calls that were not allowed previously to be sure. Those were calls the government could always make itself, so the government has always been able to do this. Now you have people doing it on the government's behalf, but you're still preventing millions of calls a day as a result of this exception. It strikes me that it is a little odd that this big wide process is going on, and then, oh, but we get to go after these. It looks like it pretty much could be severed out, isn't it, even if there's a fault? Yes, Your Honor, certainly. So we don't think there is a fault, but if there were, it's one of the clearest cases of severability. The touchstone of that analysis is congressional intent, and given that the restriction was in place for more than 23 years before this narrow exception was added, it's quite clear that Congress would have intended it to continue to have effect. So you're not believing that argument? No, Your Honor, no. We believe it is severable. Thank you. I'm here from Facebook. You look surprised. It's time. Thank you, Your Honor. Andrew Klubach on behalf of Facebook. I was lost in thought because I just learned that even though you apparently have no government debt, no relationship to the government, no borrower-debtor relationship, nevertheless, you get misdirected calls about efforts to collect government debt. Now, under the current statute, that is protected speech, yet when Facebook tries to reach someone, even if it does it in error, to warn them that someone right this moment is trying to take over their Facebook account, warn one of the users in its community of this, that is supposedly banned speech. Let me ask you, though, in the context of this case where the amendment was not in effect at the time of the allegations here, which were 2014, as I recall, then how can you bring a facial challenge to the statute with that amendment, which wasn't in effect when these events took place? First of all, Your Honor, the complaint asks for injunctive, forward-looking relief. They ask that Facebook be enjoined from making these calls going forward from the date of the original complaint. By the way, the complaint was amended. The original complaint was dismissed. The amended complaint was brought in 2016 after the statute had been amended. And if I may quote from Landgraf, Landgraf itself, the case that the government relies on to say that this retroactivity problem kills our case, Landgraf notes, even absent specific legislative authorization, application of new statutes passed after the events ensue is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive. And the Court goes on to explain that. Relief by injunction operates in futuro, and the plaintiff has no vested right in the defense entered by the trial court. So even Landgraf itself recognizes, particularly when you're looking at new exemptions that impede speech, they cite, by the way, to a labor picketing case in support of this warning to not go overboard with the retroactivity issue. But our court and others have held that the statute, leaving aside the government debt exception, is constitutional. And when those cases were decided, we didn't have the government debt exception. Why couldn't that just be sliced off and severed from the statute, and we'd be right back into the arena of cases where the statute as is was determined to be constitutional? First of all, I think it would be one of the first instances where severability is used to further limit speech. Severability is rarely, if ever, certainly wasn't in the animal defense case that Your Honor recently decided, where an exemption could have been just severed off. But instead, the point of the exemptions, as courts have found, is not that they in themselves are a problem, and that the under-inclusivity of having the exemption means we should restrict even more speech. The problem with exemptions is they reveal what is the problem with the so-called or the supposed true purpose of the statute. That is, there was not really a sufficiently compelling interest that justifies barring Facebook from warning people or trying to warn people that their accounts may be hacked. I understand your heartfelt argument on that point, which is why I said at the beginning it certainly is a bit of a no-good-deed-goes-unpunished situation, but that maxim doesn't really solve your constitutional problem with respect to binding press in it, really. Well, again, the current statute does have a content-based distinction. There's no real serious dispute over that. Every court has found that. The current statute prohibits from at least 2015, from before the date that the first amended complaint was filed, the speech that Facebook would like to make using this content-based distinction. Once there is an under-inclusivity problem that's revealed through a content-based distinction, as there is in this case, once that happens, what you do with that is you use that to consider whether the so-called compelling purpose really measures up. And the question is, if we, as Appellant said, go back to basics here, if we go back to basics, this is a world, the plaintiff's world, is a world in which a statute is supposedly narrowly even though it, as applied, prohibits this kind of speech that is nothing like the telemarketing that Congress originally sought to stop. It is nothing like even getting a telephone call where you're asked about a debt or asked to buy anything. And counsel talked about those calls that everyone is used to receiving where you're asked to purchase something or you're, get a mass generic marketing to join a sweepstakes or to get a vacation home. That's nothing like this message, which is very narrowly and specifically targeted. And if I may, Your Honor. I was kind of hoping it was that way because I get so many of those calls, but unfortunately it's not going to save my telephone answering. No. No. And there would be ways in a content neutral way to make appropriate time, manner, place restrictions on those calls. I think we'd all welcome them. For example, a very simple way to do that would be to actually ban the use of random generic pre-recorded message. That was the original, clearly the original evil that was being targeted. But what's happened with this statute, the way it has now been interpreted and the way plaintiffs would have you take the body of all of the constitutional precedent leading up to this moment and take the most sweeping, expansive interpretation of Marx, which You want it declared unconstitutional as applied or the facial part of the statute? Both, Your Honor. It certainly satisfies both. But I don't even want you to declare it unconstitutional at all, nor does the government, nor do you have to, because there are two very simple ways to avoid the constitutional issue. And that is really what this court should do. And that's what this court must start with. The very simplest way is a way that the district court did not bother to look at because of the ruling on ATDS. And this is an issue that you didn't even hear anything about because it's so clearly within the bounds of the statute, these text messages fall within the so-called emergency exception. There is already an exception built into the statute for these kinds of calls, which allows any call made for emergency purposes. And the FCC has defined emergency purpose to mean calls made necessary in any situation affecting the health and safety of consumers. But that's for things like schools and institutions like that. Well, the FCC has said that the term emergency should be interpreted broadly rather than narrowly and includes all situations in which it is in the public interest to convey information to consumers concerning health or safety. But I'm having, I know you're looking for a way to save the constitutionality issue and not get there, but I just was having really hard trouble to say that a potential hacking advice relates to health and safety. Do you have, what is your best support for that? Well, I think this court's decision, Chesbrough v. Best Buy, that simply says liability under the TCPA should be approached with a measure of common sense. The kind of- I think the statute, I mean, we'll get to that in a minute because we have to deal with marks also. But the statute says what it says and to infuse certain common sense into it as you do it, we would have to rewrite the statute, it seems to me. I don't think so, Your Honor, because when emergency isn't specifically defined by the statute, what courts do all the time is look to a dictionary definition. Can I call 911 because someone's hacking my computer? It's an emergency under your definition, so I better call 911. You also can't call 911 if the water might be out for three hours in your whole neighborhood. Correct. And yet, that kind of message has been found to be and satisfy the emergency exception. Even when an unmasked text message is sent to the entire neighborhood, including people who might be on vacation, might not be there, might face no threat whatsoever. But because it's perceived as a potential emergency, even if it's not actually an emergency, the FCC has found that to satisfy the exception. Here, if you were to learn, right, if you were in the middle of a meeting, not probably in the middle of court, but if I walk out of court and as I look at my cell phone, I see that, oh my gosh, somebody right this moment is trying to hack into my Facebook account and may impersonate me or do anything else that they're going to do with my personal information, I sure might believe that's an emergency, meaning it needs to be told to me instantaneously. And that's the dictionary definition. The touchstone of emergency is something that needs to, the information needs to get you right away, immediately, so I can immediately take countermeasures. So what are the other examples pertinent to Facebook where there would be emergencies for these messages that would not fall under the consent issue? Well, Your Honor, I think it's not just Facebook, but it's, right, but. I'll just say social media. I'm not trying to expand, I'll just say social media. Sure. Look, I think these days somebody trying to get unauthorized access to many different accounts, whether it's bank accounts or other accounts, could cause at least as much damage as a thief trying to jimmy into your car. You know, if you had one of those phones automatically on your car that sent you a text message, if somebody touched it or got near it or looked like they were going to break into it, for many kinds of accounts, whether it's banks or other places where people have sensitive information, or for some users, perhaps information that they keep in their own personal accounts, being notified. Yeah, go ahead. Facebook, the liberty to send it out to non-customers, the plaintiff claimed he didn't have any Facebook account. Well, again, it's the content of the message. Just like debt collectors are allowed to send messages to Judge McEwen, even though she has no relationship, because the statute allows it, the statute also allows an emergency exception when you're doing it for purposes of an emergency. If you sent an unmasked message to everyone who lived in the neighborhood, but two folks had just moved out of the neighborhood last week, they would clearly fall under the emergency exception. And Facebook is doing nothing different. And again... Let me just try to understand the practical scope of the issue, because under the Facebook terms and conditions, if someone is a Facebook customer, and I don't know what it says regarding former Facebook customers, but if you are a Facebook customer, presumably within the terms and conditions, you've consented to receive communications from Facebook, correct? Presumably. Okay. So that's the hugely vast majority of the people that would be involved here. I take it that... Do you have other instances where Facebook is sending messages to individuals who it knows are not Facebook account holders? No, Your Honor. Okay. So let's stop there. So we now have a universe of Facebook account holders who have an agreement with Facebook under the terms and conditions. And then we have Facebook over here who, in its view, is not sending messages to non-account holders. So this situation potentially falls in the cracks of somehow a message went to an individual who's not a Facebook account holder. Do you have any sense of the scope of that sort of overlap there? The reason this is a class action, and I think the plaintiffs would say they're seeking damages for allegedly millions of calls, with two billion customers and people moving or changing their cell phones, that it can be expected to happen quite a bit. And that's why this case is being brought, because it does have a significant potential liability. Is there a safe harbor? Isn't there an FCC safe harbor for reassigned numbers, for example? They're working through new statutes on that. The D.C. Circuit just struck down the FCC's last effort in ACA. And so that's an open situation right now. But Your Honor, if I may very briefly, again, even with marks, and we spent no time on this and it really has not been rebutted at all, if you take the interpretation plaintiffs would have you say, which marks means an ATS is any device that stores a number and then If that's what marks means, then every single iPhone qualifies as an ATDS, because every single iPhone, at least since 2017, automatically sends messages if you set it that way. It has a built-in feature. And it does, and this statute doesn't just stop you. I agree that it could be read that way, but you had a second way besides the emergency exception that you felt the statute would be able to be safe. What's the second reason? The second way is to read marks very carefully, because marks very carefully, the court in that case, paired up stored with to be called. And in marks, they looked at this text communication system, which was a device that was specifically designed for telemarketing. Its whole purpose was telemarketing. It sends out thousands and thousands of automatic saved messages for telemarketing. And with those facts, and with the interpretation of the statute that links stored to be called, and the finding that the text communication system at issue in marks was designed for a whole bunch of numbers, hundreds of thousands, to be called. That's very different here, where there is no allegation that Facebook en masse sent out these messages or intended to, but just that it would wait for the good deed and when the good deed was required because of a very specific event at a specific time with a specific browser. And it would be to be called. I mean, in other words, why? It may be that marks, of course, took the most expansive approach to storage, not being linked to anything else, but there are obviously databases that groups have that are not really meant to be called, like just customer databases where you punch in your grocery store, preferred customer ID. They're not going to call you up, but you just tell them and then you get five cents off your oranges. But what is the purpose of Facebook storing these numbers, if at all, other than to be It's pled in the complaint. There is a security feature called login notification where you give your cell phone number to Facebook. If someone tries to log into your account, you can set it up so you get a code on your cell phone and then you can immediately take action. And the plaintiffs plead that in their complaint. They've pled themselves out of this being the kind of system that was issued at marks. And I would refer your honors to paragraphs 23 to 27 of the complaint, because it is not pled that Facebook sent random generic messages like the ones that issue in marks. To the contrary, it's very specifically pled that even though the messages followed a template, they were extremely specific, not even the same one. Again, that goes back to the good intention of wanting to let people know that an account associated with this number might be being accessed. But how does that targeting get you out of the marks definition? Because there's no allegation that all those numbers that are in that system are there to be called any more than all the numbers in my cell phone are there to be called. In both cases, they may be called for my cell phone if I'm driving. And if you would have the whole case boiled down to to be called is different than might or may be called. It's the only way you can reconcile marks without sweepingly bringing in basically every single call that I ever make, even manually with my cell phone, or these kinds of messages that so clearly were not the evil that Congress was trying to prevent. If not, then this statute will fall under lands graph prospectively because the exception reveals that it is not narrowly tailored, but instead it is restricting virtually all to its own users, even when it's not trying to sell them anything, but it's trying to do a good deed. Thank you. Thank you. So first of all, Judge Ikuda in the Marks decision italicized the word automatic. I believe not once, but twice. The touchstone here is that the system Facebook used here, the complaint pleads, was an automatic system that falls squarely within Marks. Point number two, the emergency exception on which much time was spent. There is case law on this, district court case law, and there's a decision by Judge Chambray in the Northern District, and there's a decision called PAP versus CVS in the Eastern District of Pennsylvania. The basic premise is this. Plaintiff says, I got a bunch of calls from CVS. They were calling me because for somebody else's prescription, I told them, stop calling. They kept calling. CVS comes in and says, emergency. We were delivering medication. District judges say, no, no, no, no, no, no, no. Once the consumer tells you, nothing in the court of appeals on that. But the logic is sound. Once the consumer tells you, stop calling, it's not me. The emergency evaporates. There is no longer an emergency. At least two decisions, there may be three, but the two that I know of because they were by my firm. And according to the complaint, you communicated that electronically. Using Facebook's specific instructions, and the messages continued. That's on that. The idea, broadly speaking, of course, is that Facebook here is using an automated system to send text messages. Yes, it's a different kind of automated system that is used to transmit other types of text message spam. Nonetheless, it falls within the statute. It falls within the, it's a regulated system. They are allowed to use it. I cannot emphasize this enough. It's not a statute that forbids Facebook from using the system. They are free to use it. The reason they are being sued here is not because they were using the system. It's because they were misusing the system. And the system was generating text message spam to my client, to others like him. And there was no way, no way to turn it off. They have, you cannot turn it off by saying off. You cannot turn it off by emailing Facebook. There's just nothing to be done except going to court, which is what Mr. Duguid did here. That is all I have. All right. Thank you. Thank you. Thank you. Thanks to all counsel for your argument this morning. The case of Duguid versus Facebook with the United States as intervener is submitted.
judges: Siler, Wallace, McKeown